Thank you, Your Honors. My name is Matthew Gunn, and I represent the appellant in this matter, Mr. Lynn Sorenson, and I would like to reserve five minutes for rebuttal. Your Honors, we are here today because the District Court erred in granting the City of Caldwell's motion for summary judgment with regards to both of Mr. Sorenson's claims for age discrimination and termination in violation of public policy. Now both of these claims brought by Mr. Sorenson require him to establish that there was an adverse employment action taken by the City of Caldwell as part of his prima facie case. In granting summary judgment, the District Court ruled that Mr. Sorenson could not, as a matter of law, establish any triable facts under which a reasonable jury could conclude that he constructively discharged from his employment with the City of Caldwell. And now this ruling felled Mr. Sorenson's claims at the very first hurdle. The District Court's ruling is erroneous because there exist genuine issues of material fact precluding summary judgment, and there is more than sufficient evidence and facts upon which a jury could conclude that a reasonable person in Mr. Sorenson's position would have felt compelled to resign and not continue to endure these intolerable circumstances. Give me the best couple of facts that you have that compelled Mr. Sorenson to resign. Yes, Your Honor. The District Court made two factual determinations in ruling that Mr. Sorenson could not establish constructive discharge. The first was that over a month had elapsed since the last harassment and Mr. Sorenson's decision to constructively discharge. This decision, though, this factual determination doesn't hold up to closer scrutiny. The harassment in question that the Court is referring to as the last harassment, this took place on March 20, 2012. Mr. Sorenson that day reported the harassment to his supervisor. Well, there's some dispute as to whether it was that day or the next day, but it doesn't strike me as material either way. Correct, Your Honor. It was contemporaneous. I think we could all agree with that, whether it was that day or the next day. And then there was about a month delay. Right. And there was about a month delay. Right. Okay. Vacations in there. There's an 11-day. We had a criminal complaint filed. Yes, Your Honor. Could I ask you this to kind of, because your time is ticking. From the time they got back, they did the report, there's an investigation. I think we know we understand that. Then they called him in for a meeting, right, and I'm paraphrasing, but when that happened and he learned that the supervisor was not to be fired, but he wouldn't be his report, how long did it take for him to resign? Four days. It took him four days to decide whether or not to constructively resign, Your Honor. The investigation began 11 days after the report. It took 14 days to conclude the investigation. Investigation results come out on April 16th. He thinks about it for a little bit. He doesn't go to work. He can't sleep. Were those four days a weekend? Did that involve a weekend? I do not recall if it involved. I don't believe so. I believe he showed up on a Monday. Okay. So you've just told us why you're distinguishing this case basically from Montero. But Judge Bybee's question was a little different. What are your best facts to show that your client was constructively discharged? Thank you, Your Honor. That was the first fact that I would submit because there is little elapsed time between learning that Mr. Wheeler maintaining his employment to the decision to constructively discharge. The two other key facts here that would give rise to a tribal issue for constructive discharge are the fact that Wheeler being sent back to the Gulf Department simply recreates the exact same command and control structure that was in place prior to August 22nd, 2011. But your client worked in parks and rec. Yes, Your Honor. Throughout this entire period, prior to August 22nd, 2011, this is a key date. August 22nd, 2011 is when they combine parks and golf into the land and facilities department. They've re-divided them. I'm sorry? They've again separated them. Correct. They separated them again in 2012. Wheeler is on the golf side. Correct. Your client is on the parks and rec. side, and he's been advised by HR that Wheeler will not have any contact with him. Correct, Your Honor. But this is a hollow assertion. Mr. Sorensen very permissibly, and a reasonable jury can find, did not put any weight or water into this assertion that we have separateness because of the fact of the conduct prior to the August 22nd, 2011 merger. Prior to that merger, we had the exact same situation that was created on April 16th, 2012, which is specifically Mr. Wheeler at golf, Mr. Sorensen at parks. This is what existed from 2009 when Mr. Sorensen came on with parks until August 22nd, 2011 when they were merged. And Your Honor- Counsel, you're, absolutely the best fact is the horrific exchange between Wheeler Sorensen and, I don't know how you pronounce him, Rapikon? Grant Rapikon, Your Honor. And Rapikon. And when I read Mr. Sorensen's description of that, Rapikon doesn't remember much, it was an awful incident. It was. It was a serious incident. It resulted in a criminal charge and was reported contemporaneously. And that is, would be a great concern to me. Of course, that was not directed, that was not directed right at Mr. Sorensen. And he's complaining about age discrimination, not somebody else that he slapped Mr. Rapikon. So I'm having a hard time figuring out where Mr. Sorensen feels that he has been constructively discharged because of the possibility that Wheeler might, you know, bleed over someday and call him some names, even though he's been warned not to and he's been counseled and he's been, and Sorensen's been advised, he's been put on notice not to do any of those things. I mean, the city is, the city, it seems to me, has been very responsive here. And they certainly considered firing Wheeler, was one of the options they considered. They decided to do something less than that. But it's not, but it doesn't strike, I'm not, I'm struggling to figure out why Sorensen had to resign because the situation had become intolerable. Thank you, Your Honor. Mr. Sorensen's testimony, which we have to credit at this stage of the summary judgment proceedings, and this is in the record on page 56 of the record, his going back to his deposition testimony. Now recall that prior to 2011, Mr. Wheeler is part of Gulf and Mr. Sorensen is part of Parks. He's not a direct report. Everything is separate. We have extensive testimony from Mr. Sorensen that in 2009 that he was reporting age discrimination to Monica Jones at Human Resources for the City of Caldwell extensively. He says, I am reporting to Vinton Howell, who's my direct report, extensively on a daily basis. He's, as far back as 2009, when Mr. Wheeler is part of a completely separate department, Mr. Sorensen is reporting daily about age discrimination. Not just what he witnessed as far as the terrible incident with Mr. Rapikon, but it is also worth noting that as part of that terrible incident with Mr. Rapikon, Mr. Wheeler testifies on page 80 of the excerpts of record, that as part of that incident with Mr. Rapikon, when he flew off the handle, he referred to Mr. Sorensen as dumb, old, can't get with it. So we have a continuous pattern, 2009, 2011, 2010, Mr. Sorensen is reporting, he's doing everything he can, but nothing is happening. And then the city, their idea of remediating the situation is to go back to exactly how things were prior to August 22, 2011. So in February, February 2012, the HR director, I don't know if that's the right title, but the HR person, Jones, told Wheeler not to have contact with the parks employees, right? Correct. And he did anyway. And that preceded, it seems to me, that preceded what Judge Bybee's just described as a horrific incident I think on March 20th. On March 20th, correct. So what concerned me about the responsiveness of the city was when the final meeting happened and he was told there wasn't going to be a retaliation, there was this comment made, if it happens again, let me know and I'll escort him out of town. It seemed to be an acknowledgement that Wheeler had been given the very same instruction earlier Your Honor, L.J. Waite makes the comment that he's on a short leash. And so, I'm sorry, Waite is what, where in the hierarchy? He's the city's finance director. He's not a direct report, but he's involved in these investigations. City of Caldwell is not a large city. We see earlier in 2010 that Mr. Sorensen is making direct reports to the mayor. So this is a Okay. Right. Okay. So that's, I guess, why he's the finance director and is involved in this meeting, so it struck me as odd. But anyway, he was in the meeting and Sorensen was there and Jones was there. And so, in what context, can you give me context for that comment, if he does it again, that seems? It's an understanding that it's a clear representation that there's this known history with Wheeler and everyone is expecting this to happen again. In the audio of the meeting in which Mr. Sorensen finally resigns, he's talking to Vinton Howell, who is his direct report. Mr. Howell's direct quote, who had been working with Mr. Wheeler for years is, it's not a matter of if, or I'm sorry, it's not a matter of if, it is a matter of when Mr. Wheeler does this again. And there's, and the evidence is replete that there's no way with the relationship between Parks and Golf that you can separate Mr. Sorensen from Mr. Wheeler. And so if Wheeler had come back and called him old again, that would have been, that was enough to show constructive discharge? I'm sorry, I'm not following you. So if Wheeler had come back, if it was not a matter of if, but when, and at some time after April of 2012, Wheeler had come back into the shop, seen Sorensen and called him old, this, this would have been justification for, for quitting the job? Your Honor, this, this age-based discrimination has gone on for years and it has been constantly reported. And there is no, it's never been anything other than names, right? It is extensive and pervasive name-calling and, and, and constant comments about a job, the job performance, the ability to do a job, which is the inherent essence of the job, is saying that you can't do the job because of your age. And that is the inherent essence going to the job performance and the ability and, and, and the right of an employee to be free from that kind of age discrimination, Your Honor. Counsel, the comment... He's not a supervisor though, right? I'm sorry? He's not his supervisor? Who is his supervisor? It's not the supervisor that's calling the names, right? Pre-August 22, 2011, Mr. Sorensen's direct report is Benton Howell, but there is a great deal of evidence in the record that even prior, when Mr. Wheeler was not Mr. Sorensen's direct report, that they interacted frequently, constantly, this age discrimination occurred. These departments, even though they were technically separate, golf and parks, were closely intertwined. From August 22, 2011 until April 16, 2012, the, the chain of command is Wheeler, Howell, then Sorensen. And then they break that back out to exactly how it was prior to August 22, 2011. And that's their idea of remedying the situation, is to go back to exactly how it was before when we had years of age discrimination reported to the mayor, reported to Human Resources. When, on the March 20th incident, which I think Judge Bribie correctly noted, your client witnessed it, but wasn't, he wasn't the direct recipient, certainly on the receiving end of the physical abuse. Is the record that, well, I guess I know this part, but I don't, I'm not sure why. I'm looking for the context of whether or not Wheeler, it seems like he was making age-related marks at, towards Rapicon as well on that day. Also about getting out of the 60s and whatnot, and called him these names before he struck him. Was there, is there a history? Were those conversations, was there concern that those were also age-related, directed at Rapicon? Rapicon's 31, isn't he? Your Honor, I'm uncertain of age-related comments directed to Rapicon. Well, it's in the record, and I think it's also in the record that he's much younger, and that's why I'm asking. I can't speak to why he might say that about Rapicon. I can point to, again, in the record on page 80, that as part of that incident, that Wheeler was directing clear comments about age towards Mr. Sorenson. Okay, so he came in and made those comments towards Mr. Sorenson on March 20th? Yes, Your Honor. And then went to the, okay, and couldn't get the program ramped up, Rapicon couldn't, and then there's some more very abusive language. Yes, Your Honor. On excerpt of record, page 80, page 94, beginning at line 23, with regards to ... Right. So, am I wrong? Is, am I wrong about the ages? I'm sorry? Am I wrong about the ages? I don't believe that you are, Your Honor. Okay, all right. Judge Bybee, I would make one more comment going back to yours about the comments. What were they? Were these performances? I would just remind the court again that we are here on a denial of summary judgment. And I would submit that these are genuine issues of material fact as well. But whether, ultimately, whether or not Mr. Sorenson prevails, that's a different question. But we're here today on whether or not there's enough evidence that a jury could conclude. And I would submit that on this record, whether he ultimately prevails or not, there is absolutely enough evidence to try these claims, Your Honor. Thank you, Mr. Gunn. Thank you. Mr. Williams? Thank you, Your Honor. May it please the court, with the time I have, I would just like to go through the facts that were known to Mr. Sorenson on the day, or at the time he made that decision. It's sort of the reverse question of what are the best facts of Mr. Sorenson. As I have it, I think there's about seven key facts. The first is that Mr. Sorenson knew that there was an investigation into Ken Wheeler based on the March 20th incident. He knew that as part of that, Mr. Wheeler had been placed on paid leave, which is the normal situation. You place them on paid leave so that the investigation can be conducted. He also knew that Wheeler was disciplined. He did not know the specifics of the discipline, because under Idaho law, that's confidential. That's usually not shared with employees. He also knew that Wheeler had been separated from the Parks Department. He knew that Mr. Waite, L.J. Waite, and Monica Jones had both provided him in multiple meetings repeated assurances that he would be safe and protected. The comment from L.J. Waite wasn't just that. It was actually, Ken Wheeler's not just on a short leash, he has no leash. If he messes up again, he'll hang himself, meaning if anything happens again, he's out of here. And I believe he also said, I'll personally drag him out of the city, or something to that effect. What was the status of the criminal complaint? At this point, the Sergeant Kershaw was, I believe, conducting an investigation. But at this point, it had been brought to their attention, and they were investigating. It wasn't until, I believe, later in the summer that Ken Wheeler was charged with misdemeanor battery, and then it was pled down to disturbing the peace. But that came a little bit after this. So, Counsel, is it fair to say that Mr. Sorensen knew that Mr. Wheeler had been disciplined, so he knew he hadn't been terminated? Correct. Okay. Excuse me, I thought I heard a question. What is your response to opposing counsel's argument that earlier, in the February 12th time period, that Jones had previously told Wheeler to stay away, and then he didn't stay away? What's your response to that? Mr. Sorensen didn't know that that had happened. During the conversation on April 20th with Vinton Howell, Vinton Howell had a sort of vague understanding that something like that happened, and he tells Sorensen, Mr. Sorensen at the time, he's handing in his resignation, so he's already decided to resign at that point. There's some uncertainty as to what those actual instructions were. Ken Wheeler was the superintendent of land and facilities, so the idea was, realistically, you're global, you're in charge of global, Vinton's in charge of day-to-day. You go through Vinton for day-to-day stuff, but there was, as far as I know, there's nothing in the record that shows that Mr. Sorensen knew, when he made the decision to terminate, that that instruction was given, so he couldn't then factor it in as to his reason to resign. So he couldn't factor in, as far as you know, he, meeting Sorensen, couldn't factor in that Wheeler had previously disregarded in order to stay away from Sorensen. Correct. And this issue actually came up at oral argument with the district court. Judge Windmill granted the party some additional, I think, three days or so to go through the record and find something. I don't believe anyone could. The closest that I recall that that came to was that when Vinton Howell tells Sorensen about it, Sorensen starts going along like, oh, he wasn't supposed to be there then. So there's this testimony about Wheeler contacting him on the weekends, but you're saying that that was at a time when, after Wheeler had been told not to contact Sorensen, but that Sorensen wasn't aware of that instruction. Correct. Thank you. And so there were repeated assurances that he would be safe by Monica and L.J. Waite. L.J. Waite, by the way, he's the financial director, and at this time, these departments were under the auspices of the financial director, so he was the boss. At that meeting when Howell said words to the effect of, it's not a question of if, it's when, was Sorensen present? Yes, that was the meeting when Sorensen handed in his resignation to Vinton Howell. If you listen to the audio, these two, they're friends, they're having a conversation about Ken Wheeler. Vinton Howell is a very amenable, friendly guy. You can hear that in the conversation. Their subjective opinion was that Monica Jones, who conducted the investigation, had to base her opinion and her recommendation based on what the evidence she gathered in the investigation was, not any one person's personal belief. So that was ultimately the, and that's why no discipline was made against Lynn Sorensen and Grant Rapikon, because they did believe them that there was an inappropriate conduct and inappropriate comments made. Mr. Sorensen, in that same meeting with Mr. Vinton Howell, says the final straw, why I'm I don't feel like the city believes me. It's not because of age-based harassment. And that's it about that. Why is that inconsistent, though? I mean, his, again, we're trying to construe, it's very early in the litigation and we're supposed to construe everything in the light and most favorable. And his argument is, this has gone on for years and I complained and I told the mayor and I told, you know, and nothing's been done. That's his view. So why is that inconsistent, sir? Why is... So, no, it seems to me that's entirely consistent with Sorensen saying, look, you don't believe me. I've been complaining. I've been reporting. Nothing's happening here. I think that's his, again, I'm not making findings of fact. It just seems to me that's his version of the history. Right. So his version of the history would explain why he has problems at work and what the negative experience he had was. The reason for his actual decision to quit, at least how he explains it to Vinton Howell on that day, is they don't believe me. I feel like anything I do in the future now, they're not going to believe me and it's just a matter of time before I get canned because nobody believes me, which just wasn't the case because they disciplined Mr. Wheeler pretty significantly. Which is the next set of facts is that even though Mr. Sorensen was not apprised of what He was placed on suspension. He was placed on probation. He was required to take anger and stress management training. They actually separated out the land and facilities department. He was no longer the superintendent. So it's essentially a demotion. And there was a process put in place that if Mr. Sorensen needed to go to the golf department for any reason, he was to contact LGA Waite and LGA Waite would instruct Ken Wheeler, stay inside, don't talk to him, just don't contact. Mr. Sorensen knew that when he made the decision to quit because he talks to Vinton Howell about it on the day he turns in his resignation and is sort of dismissive of it. He just, he doesn't, he's not willing to give it a chance. And he turns in his resignation and that's the end of it. At that point, it had been a month of since the March 20th incident. I don't think the time, whether it's a month, 28 days, that's not really dispositive. It's a factor in all of these factors. That's why Montero was, I think, three or four months plus a little bit. What's your response to Mr. Gunn's argument that even though the city then separated the golf and parks and rec from each other, that just put it back in the position prior to August of 2011. It was the same old situation in which Sorensen's on one side, Wheeler's on the other side. Wheeler's going to cross the line, come over and call him names. They're going to have to interact. There is some overlap between those departments in equipment and so on. Well, I think I have two responses. The first is it wasn't the exact situation because there was a specific plan put in place to ensure that there wasn't interaction. At least as much as they reasonably can do. It's a small city, they're probably bound to see each other. The other thing is I don't think that it's reasonable to expect absolute certainty and what a city or any employer does to prevent conflict. They can only take reasonably calculated steps to do so. And by creating this plan where there would not be contact is, I think, as much as they could have done short of firing him and putting him in prison or incarcerating him, which he was being investigated for. It was a city investigation. County would have prosecuted it, I believe. But it was a city- Excuse me, you just, did I miss that? You think they did as much as they possibly could have done short of- To keep them apart short of terminating and incarcerating him because- I did misunderstand you, okay, yeah, okay. Subject, any questions? I think those are the highlights of his state of knowledge at the time of his termination. Questions, I don't have anything further unless you have some questions for me. No. Thank you very much, Mr. Williams. Mr. Gunn? Thank you, your honors. I'd like to respond to a few specific points. I'd like to start with this April 20th meeting between Vinton Howell and Mr. Sorenson. This is characterized as after he had turned in his resignation letter. I encourage listening to this. There is, he turns in his resignation letter at the end of the meeting. He does not turn it in at the beginning. There's clearly, and again, at this summary judgment stage of the proceedings, construing all facts in the light most favorable to Mr. Sorenson, there's no reason to think that he couldn't have been persuaded to stay on. Talked to Mr. Howell, decided, you know what, yeah, I think I am going to give this a chance. They talked for about an hour, and then he decides at the end of this conversation to inform Mr. Howell that he has turned in his resignation. Counsel, can I just ask you this? You both give very detailed descriptions of what happened from your perspective. It's a small town, got small departments. What Judge Windmill did in this case, in my view, was a little unusual for a summary judgment. But of course, what I'm sure he would tell us if he were here is he'd say, well, I took the worst that Sorenson had to say, and I put it up there, and I believed it. And having done so, I don't believe that any reasonable jury could conclude that he had any basis for what he did in terms of quitting at that point. If that's, in fact, what Judge Windmill did, what's your best argument that it's just flat-out wrong, it can't possibly be the way summary judgment works in this case? Thank you, Your Honor. I believe a careful reading of Judge Windmill's decision indicates that he does not state at any point in time that age discrimination didn't occur. His entire decision turns on remediation. His entire decision turns on the fact that age discrimination occurred, but it was remediated. And so he had no reasonable basis to constructively discharge. And that is where the district court erred in making the conclusion that there is no triable issue of fact as to the remediation. We have a man here who has been complaining since 2009 repeatedly to his direct report weekly, daily, to the mayor, to Human Resources, and nothing has been done over this whole period of time. And so the district court decision turns on remediation, not on whether or not discrimination occurred. Indeed, Ms. Jones' Human Resources report concludes that age discrimination occurred. And I do not believe that that was the basis for Judge Windmill's decision, Your Honor. So is the idea that the, how should we think about the March 20th incident? Is it the straw that broke the camel's back? Is it, is it, is the notion that the city's just not going to rein this guy in? Or, or, or, or what is it? Because, well, or what is it? I think that's very accurate, Your Honor. We have, as the, the characterization is the straw that broke the camel's back. Because he saw what happened to Rapicon, coupled with comments at that time about his age, and him being dumb, and him being slow, and him not being able to do stuff. That's, that's me next. This is escalating. This is escalating behavior, coupled with directed comments at me about my age and my slowness. And if this is what he's capable of, absolutely this is the straw that broke the camel's back. And I do want to point out that in the discussion with Vinton Howell, Mr. Sorensen clearly evidences knowledge of the prohibition that was put in place in late February that Mr. Wheeler violated in going and interacting with Mr. Rapicon and Mr. Sorensen. And so it is clear in his mind that this behavior is escalating. And what the, what little the city has done so far has done nothing. And then their idea of remediation is to revert to a status quo that was already in place for two years in which he suffered this pervasive constant discrimination. There was no remediation. It seems to me important at this point, about whether or not Sorensen evidenced knowledge of the earlier history where Wheeler disregards the direction to stay away from Sorensen. And opposing counsel's right that that happens in that last meeting where he resigned, right? Yes, Your Honor. It's discussed in that meeting. And I submit that, again, at the summary judgment stage, taking all the facts in light, Mr. Sorensen, it clearly indicates that Mr. Sorensen was not learning of that prohibition for the first time. But also to that point, I would submit that he made a report clearly in late February, another report of Mr. Wheeler engaging in age discrimination. And then we have this March 20 incident. So even, even assuming for the sake of argument, he didn't have direct knowledge of what was said from Monica Jones to Mr. Wheeler. We have him, he knows he made a report in late February. And he knows this happened on March 20th. So it is reasonable to presume that the city didn't do anything, or if they did something, that Mr. Wheeler completely ignored it. That is a completely reasonable presumption on his part at that point in time. And neither one of those is a good outcome from Mr. Sorensen's point of view. Either the city did nothing, or they did something, and Mr. Wheeler ignored it. Either one of those is going to give rise to facts on which someone could conclude that he constructively discharged. Okay. Thank you, Mr. Gunn. We thank both counsel for the argument. Sorensen versus City of Caldwell is submitted. With that, we've completed the oral argument calendar for the day, and we are adjourned. Thank you, your honors.
judges: Bybee, M. Smith, Christen